STATE v. E. D. WARREN.

(Filed 10 June, 1960.)

**1. Constitutional Law § 12—**

The right to engage in the ordinary trades and occupations is a property right which may not be circumscribed by the General Assembly.

**2. Same—**

A business or occupation may not be regulated solely to protect the public against fraud and dishonesty, but resort in such instances must be had under the criminal laws.

**3. Same: Constitutional Law § 19—**

Persons engaged in a particular occupation may not procure the regulation of such calling in order to keep others out, since such legislation would tend to create a monopoly in contravention of Art. I, Sec. 31 of the State Constitution.

**4. Constitutional Law § 11—**

The police power is inherent in sovereignty and may be exercised by the General Assembly within constitutional limits to protect or promote the health, morals, order, safety and general welfare of society, and within the constitutional limitations the expediency of an enactment is within the exclusive province of the Legislature.

**5. Constitutional Law § 12—**

The regulation of an occupation in the exercise of the police power may be sustained only if it affirmatively appears that the occupation is clothed with a substantial public interest and the regulatory act has a rational, real or substantial relation to one or more of the purposes for which the police power may be exercised and is reasonably necessary to accomplish its purposes.

**6. Same—**

G.S. 93A regulating real estate brokers and salesmen is a constitutional exercise of the police power in the interest of the public welfare, since the relation of real estate broker and client involves a measure of trust and the business affords peculiar opportunities to such agents to extract illicit gains by concealment and collusion, and such business affects a substantial public interest in that it relates to a basic element of the economy.

**7. Constitutional Law § 10: Statutes § 6—**

An act of the General Assembly is presumed constitutional and must be upheld by the courts unless it is in conflict with some constitutional prohibition.

**8. Constitutional Law §§ 6, 10—**

The expediency of legislation within constitutional limitations is within the sole province of the General Assembly; whether an act controvenes some constitutional proscription is a matter for the courts.

**9. Constitutional Law §§ 12, 19—**

The Act regulating real estate brokers and salesmen prescribes reasonable and non-discriminatory standards applicable to all alike, and provides for the licensing of all who possess the requisite competency and good character, who can pass the examination exacted of all applicants, with provision for notice and a hearing to all whose licenses are revoked, and therefore the Act does not contravene Art. I, Sections 1, 7, 17, and 31 of the State Constitution nor the Fourteenth Amendment of the Federal Constitution.

**10. Constitutional Law § 12:    Taxation § 1c—**

Even if the fee charged applicants for real estate brokers' and agents' licenses be regarded as a tax, it is equal and uniform in application upon all of the same class, and places no arbitrary or unreasonable burden upon the pursuit of the occupation, and is valid.

**11. Criminal Law § 135—**

Where the judgment below recites that sentence was suspended with the consent of the defendant and there is no specific exception to this portion of the judgment, the recital of defendant's consent will be accepted as true in the absence of anything to indicate a withdrawal of his consent, G.S. 15-180.1, and the defendant may not upon appeal contend that he did not consent to the suspension of the sentence.

RODMAN, J., dissenting.

APPEAL by defendant from *Preyer, J.,* November 1959 Criminal Term, of GUILFORD (Greensboro Division).

This is a criminal action. The bill of indictment charges that defendant, E. D. Warren, violated G.S. 93A-1, in that he engaged in business as a real estate broker and salesman without a license from the North Carolina Real Estate Licensing Board, by negotiating the purchase and sale of a parcel of land for compensation.

Plea: Not guilty. Verdict: Guilty.

Judgment: 12 months prison sentence, suspended (with defendant's consent) for five years on condition defendant pay a fine of $1,000.00 and costs and not engage in business as a real estate broker or salesman without a license for a period of five years.

Defendant appealed and assigned errors.

*Attorney General Bruton and Assistant Attorney McGalliard for the State.*

*Adam Younce for defendant, appellant.*

MOORE, J.    Defendant assigns as error the refusal of the court to grant his motions for nonsuit and in arrest of judgment. These motions call into question the constitutionality of Chapter 93A of the General Statutes of North Carolina entitled "Real Estate Brokers and Salesmen," under which defendant was indicted.

The chapter in question makes it unlawful, and punishable by fine or imprisonment, for any person, partnership, association or corporation to engage in business as a real estate broker or salesman without a license. It defines the terms "broker" and "salesman" and the definition includes the negotiation of a sale or exchange of real estate for compensation. The Act (Chapter 744 of the Session Laws of 1957) created the North Carolina Real Estate Licensing Board, composed of five members, appointed by the Governor. Only two of the members may be licensed real estate brokers or salesmen. The compensation of members is a per diem and expenses. The Board has the power to make by-laws, rules and regulations "as it shall deem best, that are not inconsistent with the provisions of this chapter and the laws of North Carolina . . ." In order to obtain a license an applicant must take an oral or written examination "to determine his qualifications with due regard to the paramount interests of the public as to the honesty, truthfulness, integrity and competency of the applicant." Applicants for "broker" license pay a fee of $25.00, for "salesman" license, $15.00. Licenses are renewed annually upon payment of a fee of $10.00. Any surplus from fees shall go to the general fund of the State. Licenses may be revoked upon any of eleven grounds set out in the Act. Before a license is revoked licensee shall be granted a hearing before the Board after 10 days notice and may be represented by counsel. If the decision of the Board is adverse to licensee, he may appeal to the Superior Court, where there shall be a trial *de novo.*

Defendant was licensed by the Board on 1 July 1957 under the grandfather clause of the Act. His license was renewed 1 July 1958 and revoked by the Board 16 May 1959 after a hearing. Defendant did not appeal from the decision of the Board. The cause of revocation does not appear in the record. On 28 August 1959 defendant negotiated the real estate transaction referred to in the bill of indictment. He requested re-instatement of his license on 3 September 1959 and action on this request is still pending.

Defendant attacks no particular provision of the Real Estate Act. He insists that the Act as a whole is not a valid exercise of the police power and contravenes sections 1, 7, 17 and 31 of Article I and section 5 of Article V of the North Carolina Constitution and the Fourteenth Amendment of the Constitution of the United States. We may consider the Act only in its general purport and effect since it does not appear that any specific provision is called into question. *Cyphers v. Allyn* (Conn. 1955), 118 A. 2d 318, 323.

Section 1, Article I, of the Constitution of North Carolina guaran-

tees to the citizens of the State "the enjoyment of the fruits of their own labor" and declares this an inalienable right.

The basic constitutional principle of personal liberty and freedom embraces the right of the individual to be free to enjoy the faculties with which he has been endowed by his Creator, to live and work where he will, to earn his livelihood by any lawful calling, and to pursue any legitimate business, trade or vocation. This precept emphasizes the dignity, integrity and liberty of the individual, the primary concern of our democracy. It is the antithesis of the totalitarian concept of government. The right to work and earn a livelihood is a property right that may not be denied except under the police power of the State in the public interest for reasons of health, safety, morals or public welfare. Arbitrary interference with private business and unnecessary restrictions upon lawful occupations are not within the police powers of the State. Restrictions and regulatory standards may not be applied so as to prevent individuals from freely engaging in ordinary trades and occupations in which men have immemorially engaged as a matter of common right. *Roller v. Allen*, 245 N.C. 516, 518, 96 S.E. 2d 851; *State v. Ballance*, 229 N.C. 764, 769, 51 S.E. 2d 731; *State v. Harris*, 216 N.C. 746, 753, 6 S.E. 2d 854; *State v. Realty Experts* (Ala. 1942), 10 So. 2d 461, 462; *State v. Rose* (Fla. 1929), 122 So. 225, 238.

A regulatory act justified only by reason of a desire to protect the public against fraud and dishonesty may not be sustained. There is no business or occupation which is not likely to have its quota of dishonest men. The limits of police power are exceeded when government undertakes by regulation to rid ordinary occupations and callings of the dishonest and morally decadent. Resort in this area must be had to the criminal laws. Furthermore, laws may not be procured by men already engaged in an occupation in order to keep others out. The exclusion of others from a common right is a prominent feature of monopolistic action forbidden by our fundamental law. North Carolina Constitution, Article I, section 31. *State v. Harris, supra,* at page 761; *State v. Ballance, supra,* at page 771.

Our Court has in several instances declared unconstitutional acts seeking to regulate vocations. *Roller v. Allen, supra* (tile contractors); *State v. Ballance, supra,* overruling *State v. Lawrence*, 213 N.C. 674, 197 S.E. 586 (photography); *Palmer v. Smith*, 229 N.C. 612, 51 S.E. 2d 8 (a phase of optometry); *State v. Harris, supra,* (dry cleaning).

But liberty and freedom in an orderly democratic society are of necessity relative terms. Government is necessary to the preserva-

tion of liberty. And government must be vested with sufficient power and authority to maintain its own existence and provide for the general welfare. The police power of the State is exercised for the protection of the health, safety, morals, comfort and quiet of all persons and the protection of all property within the commonwealth. According to the maxim, *Sic utere tuo ut alienum non laedas,* which is universally applied, it must be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others. *State v. Rose, supra.*

The State possesses the police power in its capacity as a sovereign, and in the exercise thereof the Legislature may enact laws, within constitutional limits, to protect or promote the health, morals, order, safety and general welfare of society. Before an Act regulating an occupation can be sustained it must affirmatively appear that the Act has a rational, real or substantial relation to one or more of the purposes for which police power is exercised and that the occupation to be regulated is clothed with a substantial public interest. The Act must be reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of public harm. *State v. Ballance, supra.* "In attempting to maintain the delicate balance between individual rights and the public need, the courts . . . have evolved the following rules as guides in the judicial determination of such conflicts: (1) the purpose of the statute must be within the scope of the police power, (2) the act must be reasonably designed to accomplish this purpose, and (3) the act must not be arbitrary, discriminatory, oppressive or otherwise unreasonable." *In re Russo* (Ohio 1958), 150 N.E. 2d 327, 331.

There are professions and occupations so affected with the public interest as to warrant their regulation for the public good. *Roller v. Allen, supra.* More than fifty professions and occupations are regulated by statute in North Carolina. 17 N. C. Law Review 1. Cases dealing with some of these are: *Roach v. Durham,* 204 N.C. 587, 169 S.E. 149 (plumbing and heating); *State v. Scott,* 182 N.C. 865, 109 S.E. 789 (accountants); *State v. Siler,* 169 N.C. 314, 84 S.E. 1015 (chiropractic and suggesto-therapy); *State v. Hicks,* 143 N.C. 689, 57 S.E. 441 (dentistry); *State v. Call,* 121 N.C. 643, 28 S.E. 517, and *State v. Van Doran,* 109 N.C. 864, 14 S.E. 32 (physicians); *Ex Parte Schenck,* 65 N.C. 353, (lawyers).

Two former enactments of our General Assembly designed to regulate real estate business were declared unconstitutional. *State v. Dixon,* 215 N.C. 161, 1 S.E. 2d 521; *State v. Warren,* 211 N.C. 75, 189 S.E. 108. These Acts were held to be unconstitutional for the reason that

they applied only to real estate brokers and salesmen in designated counties and not to those in the other counties of the State and were therefore discriminatory. In the *Warren* case it is said: "The State can, no doubt, in a State-wide act, make reasonable regulations in regard to the real estate business." The Act under consideration in the instant case is a State-wide Act.

It is our opinion that the real estate business affects a substantial public interest and may be regulated for the purpose of protecting and promoting the general welfare of the people. "Real estate is one of the two great divisions of property rights, and bears as close a relation to public peace and welfare in our civilization as any species of private rights. The business of acting as intermediary between seller and purchaser in real estate transactions, the business of a real estate broker or salesman, is a lawful business, or calling, and any one has a right under constitutional guaranties of liberty and pursuit of happiness to follow it, but it is nevertheless a business which may be conducted in such manner as to promote an undesirable state of local, economic excitement and unrest, which may easily result in a degree of public distress analogous to that produced by mismanagement of a banking institution. There is involved in the relation of real estate broker and client a measure of trust analogous to that of an attorney at law to his client, or agent to his principal. The activities of persons engaged in such business are largely directed toward developing the trading abilities of the parties concerned and creating a sales value as distinguished from a conservative or substantial value of the lands involved, which not infrequently results in expensive litigation injurious to all concerned. If motives for the enactment of laws regulating such business are to be sought there would seem to be sufficient to justify them." *State v. Rose, supra,* at page 231. "The intrinsic nature of the business combines with practice and tradition to attest the need of regulation. The real estate broker is brought by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. We know from our judicial records that the opportunities have not been lost. With temptation so aggressive, the dishonest or untrustworthy may not reasonably complain if they are told to stand aside. Less obtrusive, but not negligible, are the perils of incompetence. The safeguards against incompetence need not long detain us, for they were added to the statute after the services were rendered. We recall them at this time for the light that they cast upon the Legislature's conception of the mischief to be remedied. The broker should know his duty. To that end, he should have 'a

general and fair understanding of the obligations between principal and agent.' . . . Disloyalty may have its origin in ignorance as well as fraud. . . . He (real estate broker) is accredited by his calling in the minds of the inexperienced or the ignorant with a knowledge greater than their own." *Roman v. Lobe* (N.Y. 1926), 152 N.E. 461, 50 A.L.R. 1329.

It is within the police powers of the State that the standard of "honesty, truthfulness, integrity and competency" be established and maintained by legislative act for dealers in real estate. G.S. 93A-4(b).

With the possible exception of Alaska, all the States and the District of Columbia have statutes, similar to the North Carolina enactment, regulating real estate brokers and salesmen. The constitutional validity of these regulatory Acts has been upheld by the appellate courts of twenty-one States, the District of Columbia, and the Supreme Court of the United States. Most of these decisions are discussed and classified in Annotation, 39 A.L.R. 2d, Brokers-License Law - Validity, pp. 606-624. Also see: *Bratton v. Chandler,* 260 U.S. 110; *Benham v. Heyde* (Colo. 1950), 221 P. 2d 1078; *Cyphers v. Allyn* (Conn. 1955), 118 A. 2d 318; *In re Russo, supra;* Appeal of *Young & Co.* (Pa. 1932), 160 A. 151; *Eberman v. Insurance Co.* (D. C. 1945), 41 A. 2d 844. Only the Supreme Court of Kentucky has ruled such Act unconstitutional. *Rawles v. Jenkins,* (Ky. 1925), 279 S.W. 350. But it later overruled this decision. *Miller v. Real Estate Com.* (Ky. 1952), 251 S.W. 2d 845; *Shelton v. Mc-Carroll* (Ky. 1948), 214 S.W. 2d 396.

We are not bound by the decisions of the Courts of the other States, but should this Court hold the Act unconstitutional, North Carolina would be the only State to maintain this position. Such overwhelming authority is highly persuasive.

The presumption is that an act passed by the Legislature is constitutional, and it must be so held by the courts unless it appears to be in conflict with some constitutional provision. *Roller v. Allen, supra; State v. Dixon, supra; State v. Hurlock* (Ark. 1932), 49 S.W. 2d 611, 612. The legislative department is the judge, within reasonable limits, of what the public welfare requires, and the wisdom of its enactments is not the concern of the courts. As to whether an act is good or bad law, wise or unwise, is a question for the Legislature and not for the courts — it is a political question. The mere expediency of legislation is a matter for the Legislature, when it is acting entirely within constitutional limitations, but whether it is so acting is a matter for the courts. *State v. Harris, supra;*

*State v. Rose, supra; State v. Hurlock, supra; Cyphers v. Allyn, supra.*

The Legislature has interpreted the needs of the State and declared its policy. The Act is within the police powers of the State. It does not contravene the "fruits of labor" or "law of the land" clauses of our Constitution. It does not violate the Fourteenth Amendment of the Constitution of the United States. The Act is not unreasonable, arbitrary, destructive or confiscatory. The standard set is reasonable and nondiscriminatory. All who qualify according to the established standard are free to pursue the vocation of real estate broker and salesman. All whose licenses are revoked have the right to be heard and may be represented by counsel; their cause may be heard *de novo* in Superior Court and the right of further appeal is not denied. See also G.S. 143-306 *et seq.* It is observed here that defendant did not avail himself of the right to appeal from the decision of the Licensing Board.

A majority of the Licensing Board are not real estate brokers or salesmen. The Act creates no special privileges or emoluments except in consideration of public service. It does not create a monopoly. The door is open to all who possess the requisite competency, good character and can pass the examination which is exacted of all applicants alike. *Roach v. Durham, supra.*

In our opinion the fee charged applicants for license is not a tax. It is imposed to defray the expenses of regulation and is not excessive. It is true the surplus, if any, goes into the general fund of the State. It makes no difference that revenue results incidentally. *Davis v. Hailey* (Tenn. 1921), 227 S.W. 1021, 1022. But assuming that it is a tax, it is equal and uniform in application to all in the same class. It places no arbitrary and unreasonable burden upon the pursuit of the occupation. *Roach v. Durham, supra; Urban v. Riley* (Cal. 1942), 131 P. 2d 4, 6.

Appellant finally contends that he did not consent to the suspension of the prison sentence, that his exception to the judgment and notice of appeal therefrom negatives consent, and that the judgment below should be stricken and the cause remanded for proper sentence, should the Act be declared constitutional. *State v. Moore*, 245 N.C. 158, 95 S.E. 2d 548. Chapter 1017, Session Laws of 1959 (G.S. 15-180.1) provides that a defendant may appeal from a suspended sentence. It further provides "that by giving notice of appeal the defendant does not waive his acceptance of the terms of suspension of a sentence." The judgment below recites that the sentence was suspended by and with the consent of the defendant.

There was no specific exception to this portion of the judgment; there is only an exception to the judgment generally. In the absence of anything to indicate withdrawal of consent, the recital by the court is accepted as correct and true.

In the trial of the cause and the entry of judgment in accordance with the verdict, we find

No error.

RODMAN, J., dissenting: The Court declares its approval of the principles enunciated in *S. v. Harris*, 216 N.C. 746; *Palmer v. Smith*, 229 N.C. 612; *S. v. Ballance*, 229 N.C. 764; *Roller v. Allen*, 245 N.C. 516; and *S. v. Brown*, 250 N.C. 54. I likewise express my complete approval of what is said in those cases, and because I am unable to draw any logical distinction between the act here upheld andi the acts there held void, my vote is to reverse.

I think an additional reason requiring reversal is the failure of the act to prescribe any standards which the Board must employ in determining the right to a license. The Legislature cannot delegate its discretionary power. It must prescribe standards and, having prescribed the standards, may authorize an agency to ascertain the facts. *Harvell v. Scheidt*, 249 N.C. 699; *Utilities Com. v. State* and *Utilities Com. v. Telegraph Co.*, 239 N.C. 333; *Coastal Highway v. Turnpike Authority*, 237 N.C. 52. The Licensing Board is authorized to require an examination to determine applicants' "honesty, truthfulness, integrity and competency." Unless competency is synonymous with honesty, truthfulness, and integrity, no standard is prescribed to measure competency, and such failure under our decisions is fatal.